**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | |
|---|---|
| **ALEX A. MASON,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 2:04CV32-DJS |
| ) | |
| **CORRECTIONAL MEDICAL SERVICE, INC.,**) | |
| **MISSOURI DEPARTMENT OF CORRECTIONS,**) | |
| **JIM MOORE, JAMES CARTER,** ) | |
| **GARY KEMPKER, DR. GARY CAMPBELL,** ) | |
| **DR. GAVETT, MASON EYE CLINIC,** ) | |
| **DR. DEAN P. HAINSWORTH,** ) | |
| **DR. LENWORTH N. JOHNSON, and** ) | |
| **DR. HENDRIX,** ) | |
| ) | |
| Defendants. ) | |

**ORDER**

Plaintiff, an inmate at Northeast Correctional Center ("NECC"), awoke on July 15, 2003, with a headache and blurred vision in his only functional eye. After examination by defendant Dr. Christine Gavett, the prison optometrist, and defendant Dr. Jason Hendrix, an ophthalmologist at defendant Mason Eye Clinic, plaintiff was sent back to his prison cell. The following morning plaintiff awoke completely blind and did not receive any medical attention until July 22, 2003. Three of the four counts from plaintiff's first amended complaint, which was prepared by appointed counsel, remain before the Court.[1] Count I seeks an

---

[1] Plaintiff's claims against defendants Dr. Gavett, Mason Eye Clinic, Dr. Dean P. Hainsworth, Dr. Lenworth N. Johnson, and Dr. Hendrix have been dismissed.

injunction to provide plaintiff medical treatment to restore his vision and has been asserted against defendants Missouri Department of Corrections ("MDOC"), Correctional Medical Services ("CMS"), James Carter--a Functional Unit Manager at the NECC, Jim Moore--Superintendent of the NECC, and Dr. Gary Campbell.[2]  Count III asserts a claim of deliberate indifference to a known, serious medical need against defendants Carter, Moore, and Campbell.  Finally, Count IV seeks injunctive relief against defendants MDOC, Gary Kempker--whom plaintiff identifies as the Superintendent of the NECC, Carter, and Moore for alleged violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.

Now before the Court are the motion for summary judgment of defendants Campbell and CMS [Doc. #100] ("defendant CMS's motion for summary judgment"), the motion for summary judgment of defendants MDOC, Kempker, Moore, and Carter [Doc. #115] ("defendant MDOC's motion for summary judgment"), and plaintiff's motion for partial summary judgment [Doc. #120].  In considering a motion for summary judgment, the Court must "view all of the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from the facts

---

[2] The parties dispute whether defendant Campbell was defendant CMS's Regional Medical Director for the NECC during July 2003.  A document dated almost four years prior to the incident constitutes plaintiff's only support for this assertion.  Defendants contend that during the period in question defendant Campbell was the Vice President of Medical Services at the NECC.

disclosed in the pleadings." <u>Reich v. ConAgra, Inc.</u>, 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Although the moving party has the burden of demonstrating the absence of genuine issues of material fact, the nonmoving party must go beyond the pleadings and set forth specific facts sufficient to raise a genuine issue for trial. <u>Id.</u> at 324. Upon careful consideration of the instant motions, the Court will grant defendant CMS's motion for summary judgment in full; grant defendant MDOC's motion for summary judgment in part with respect to all claims asserted against defendants MDOC, Moore, Carter, and Kempker, excepting Count III as asserted against defendant Carter; and deny plaintiff's motion for partial summary judgment.

### **Background**

In deciding the motions, the Court has viewed the facts in the light most favorable to the nonmovants. As the Court will deny plaintiff's motion for partial summary judgment, the following facts have been viewed in the light most favorable to plaintiff and are thereby established for purposes of the summary judgment motions. Prior to July 13, 2003, plaintiff lost vision in his right eye as the result of a childhood accident, but retained function in his left eye. On the mornings of July 13 and July 14,

2003, plaintiff awoke with his nose and both eyes swollen and running. The following morning, July 15, 2003, plaintiff's vision through his left eye was blurred and he was suffering from a severe, throbbing head pain.

A prisoner may access the medical area of the NECC during sick call, which takes place at approximately seven or eight o'clock in the morning, by filling out a Medical Services Request form or at any time by self-declaring an emergency and informing any NECC officer or staff member. After requesting medical treatment for his condition, plaintiff was sent to the prison optometrist, defendant Gavett, that same day. Upon examining plaintiff, defendant Gavett noted inflammation and swelling around the optic nerve, and assessed plaintiff with possible Central Retinal Artery Occlusion ("CRAO").[3] Based on her examination, defendant Gavett declared plaintiff's condition to be an emergency and immediately had him transported to a specialist facility, defendant Mason Eye Clinic, to be seen by defendant Hendrix. Defendant Hendrix diagnosed plaintiff with background diabetic retinopathy and possible nonorganic vision loss, and recommended a yearly exam and a neuro-ophthalmology examination if plaintiff's condition persisted or deteriorated. Specifically, defendant Hendrix confirmed that no acute event, such as CRAO, was identified

---

[3] CRAO occurs when a blood clot lodges in a central retinal artery, which eventually results in blindness.

and indicated that CRAO was unlikely.  Plaintiff was subsequently sent back to the NECC.

On the morning of July 16, 2003, plaintiff awoke completely blind.  After being led by another inmate to defendant James Carter's office, plaintiff informed defendant Carter of his blindness and increasing pain, and requested medical treatment.[4]  Defendant Carter's responsibilities as the Functional Unit Manager for Housing Unit 4, where plaintiff was housed, included receiving prisoner complaints of inadequate medical treatment and determining whether the prisoner's medical condition constituted an emergency.  Defendant Carter told plaintiff that he would forward plaintiff's request for immediate medical treatment to the appropriate medical personnel.  Plaintiff was not seen by a medical professional between July 16 and July 22, 2003.[5]  From July 17 to July 22, 2003, plaintiff could not leave his cell or attempt to walk around due to his blindness and pain.

On July 22, 2003, the next time defendant Gavett came to the NECC, she saw plaintiff again and noted plaintiff's worsened condition.  Plaintiff complained that he could not see anything and

---

[4] Plaintiff asserts that defendant Carter and defendant CMS's employees were informed of plaintiff's worsening condition by various other inmates and plaintiff's family members, respectively.  However, plaintiff has not provided the Court with affidavits of any of the inmates or family members to establish that defendants were given such notice.

[5] Defendant Carter does not remember whether he spoke to plaintiff during this time frame.

that on July 16 his eyes had started throbbing. After performing her optometric examination, defendant Gavett contacted CMS personnel and obtained permission to refer plaintiff to an ophthalmologist.[6] Defendant Dr. Lenworth N. Johnson, an ophthalmologist at defendant Mason Eye Clinic, examined plaintiff and found that plaintiff's condition had significantly deteriorated since July 15. Defendant Johnson noted the presence of CRAO and inflamation in plaintiff's left eye. According to defendant Gavett, the only treatment for CRAO is an eye massage within the first five to ten minutes of its onset, but the treatment is 99 percent ineffective. On August 19, 2003, plaintiff was prognosed as permanently blind.

Dr. Gregory Hill, an ophthalmologist, performed an independent medical examination of plaintiff on December 9, 2005. On March 31, 2006, Dr. Hill issued an initial report stating that he does not expect any return of function to plaintiff's left eye. Dr. Hill's second report of August 22, 2006, concluded that,

> Mr. Mason suffered a devastating and unfortunate event leading to loss of vision in his only good eye in July, 2003. Although the exact etiology of this event has

---

[6] Plaintiff asserts that he heard defendant Gavett refer to defendant Campbell during this conversation with CMS personnel, however neither the medical records nor defendant Gavett's affidavit confirm this. Plaintiff's medical records indicate that a Dr. Conley approved the referral to defendant Mason Eye Clinic, not defendant Campbell. (Pl.'s Ex. 3 [Doc. #107-4] at 1.) Furthermore, defendant Gavett's affidavit of January 9, 2006, confirms that she referred plaintiff to defendant Mason Eye Clinic on July 15 and July 22, 2003, after being authorized by Dr. Conley. (Pl.'s Ex. 2 [Doc. #107-3] at 2.)

6

> never been fully elucidated, there was a presumptive
> diagnosis and appropriate treatment instituted. Assuming
> the examination on July 15, 2003 was accurate and there
> was no such uveitis present at that time, and although
> topical drops appear not to have been administered in the
> appropriate fashion initially, there was nothing that
> could be done to preserve vision once this event
> occurred.[7]

(Pl.'s Ex. 6 [Doc. #107-7] at 2.) To date, plaintiff remains blind in both eyes.

After losing his sight, plaintiff has not continued his regular weight-lifting activities, nor has he accessed reading materials for the visually impaired. His request to use the handicap dining table, which is only utilized by offenders in wheelchairs, has been denied. Subsequently, plaintiff was cited for going to the dining hall during early call and sometimes does not eat meals due to his difficulties in navigating the crowds.

As the ADA On-site Coordinator for the NECC, Douglas Prudden receives questions and concerns about ADA-related issues from both prison staff and offenders, and resolves the issues or recommends courses of action to the Superintendent. Defendant MDOC, its officials, and Mr. Prudden are aware of plaintiff's disability. Mr. Prudden has provided plaintiff with an untrained prisoner assistant, granted plaintiff the right to use audiotapes for correspondence, allowed plaintiff to receive audio books by

---

[7] Dr. Hill's report does not conclude when the event leading to plaintiff's loss of vision occurred, aside from noting that it was during July 2003.

mail,[8] permitted plaintiff to possess a tape recorder, secured free postage for plaintiff, contacted the Missouri Department of Social Services on September 2, 2003, to obtain services for plaintiff, and consulted with Vicky Meyer, the ADA Site Coordinator for defendant MDOC, about resources available to plaintiff.[9] Mr. Prudden never received a response from the Department of Social Services and has not followed up on the correspondence.

## Analysis

### A. Section 1983 Deliberate Indifference Claims

Plaintiff has pled Counts I and III under 42 U.S.C. § 1983, alleging "the violation of a right secured by the Constitution and laws of the United States," namely plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. West v. Atkins, 487 U.S. 42, 48 (1988). In order to establish an Eighth Amendment violation on the basis of inadequate medical care, a prisoner must allege acts or omissions that reveal "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). To prove deliberate indifference, "an inmate must show both that he or she had an objectively serious

---

[8] The Wolfner Library, which is run by the State of Missouri, provides audio books free of charge to visually impaired offenders who request them.

[9] Plaintiff disputes that he has access to audio books and cites to Mr. Prudden's deposition in support of this allegation. However, Prudden's deposition clearly states that plaintiff does have access to audio books and a tape player through the Wolfner Library.

8

medical need and that the defendant knew of and disregarded that need." Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997). Actual knowledge of a serious risk is required: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned" under the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 838 (1994). On the other hand, on appropriate facts the requisite knowledge "may be inferred from . . . the very fact that the risk was obvious." Coleman, 114 F.3d at 786. Plaintiff has only established a genuine issue of material fact concerning whether defendant Carter learned of plaintiff's condition the morning of July 16, 2003, and disregarded the risk to plaintiff's health, as asserted in Count III. Otherwise, judgment will be entered in favor of defendants MDOC, CMS, Carter, Moore, and Campbell on the appropriate counts.

**1. Injunctive Relief for Restorative Medical Treatment**

Plaintiff's deliberate indifference claim in Count I seeks to enjoin defendants MDOC, CMS, Carter, Moore, and Campbell from refusing to authorize, facilitate and provide medical treatment to restore plaintiff's vision. As noted by defendants' motions for summary judgment, the Court should consider the following factors in determining whether to grant a permanent injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting

the injunction will inflict on other parties . . . ; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). Notably, plaintiff's motion for partial summary judgment and responses to defendants' motions never directly address any of the factors.

Dr. Hill's independent medical prognosis indicates "there was nothing that could be done to preserve vision once this event occurred." In fact, none of the doctors who have examined plaintiff since July 2003 has opined that it is possible to restore plaintiff's vision. A mere disagreement as to the proper medical care, absent allegations of neglect or mistreatment, should be left to the medical judgment of the physician. Seward v. Hutto, 525 F.2d 1024, 1024 (8th Cir. 1975). As plaintiff has no medical support for his assertion that further treatment would restore his vision, judgment will be entered in favor of defendants MDOC, CMS, Carter, Moore, and Campbell on Count I.[10]

### 2. Deliberate Indifference for Delay in Medical Treatment

---

[10] As defendant Campbell is no longer employed by defendant CMS and thus does not provide plaintiff with any medical care, the request for an injunction against defendant Campbell is moot. See Martin v. Sargent, 780 F.2d 1334, 1339 (8th Cir. 1985) (finding that a "prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions").

Count III asserts a claim of deliberate indifference against defendants Carter, Moore, and Campbell in their individual capacities for their actions, or the lack thereof, while plaintiff was left in his cell from July 16 to July 22, 2003, without medical treatment. Neither "a mere negligent failure to diagnose or treat a condition" nor "an alleged delay in the receipt of medical treatment" is sufficient to state a claim of deliberate indifference. Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992); see also Estelle, 429 U.S. at 105-106; Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995). As noted above, "an inmate's mere disagreement with the course of medical treatment does not give rise to a constitutional claim." Martinez v. Turner, 977 F.2d 421, 423 (8th Cir. 1992); Martin, 780 F.2d at 1339. Plaintiff must present "'verifying medical evidence' that the defendants ignored an acute or escalating situation **or** that delays adversely affected the prognosis given the type of injury in this case." Dulany v. Carnahan, 132 F.3d 1234, 1243 (8th Cir. 1997) (emphasis added) (citation omitted). Blindness, in certain circumstances, constitutes a presumptively serious medical condition in need of treatment. See Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996) (allegation that deprivation of eyeglasses caused plaintiff to fall and walk into objects sufficient to state medical care claim under Section 1983); Benter v. Peck, 825 F. Supp. 1411, 1416 (S.D. Iowa 1993) (finding that a legally blind inmate who requires, but does

11

not have, eyeglasses to function in the general prison population has a serious medical condition); Weaver v. Jarvis, 611 F. Supp. 40, 44 (N.D. Ga. 1985) (finding evidence that prisoner's symptoms were consistent with a number of disease processes which could result in blindness raised a substantial fact issue as to whether sheriff and physician were deliberately indifferent in failing to provide further treatment).

As outlined above, when plaintiff was seen on July 15, 2003, defendant Hendrix found that an acute event, such as a CRAO, had not occurred. At some point after that examination, a CRAO occurred in plaintiff's left eye. When plaintiff awoke blind and in pain on July 16, 2003, he informed defendant Carter of his condition. As defendant Gavett has noted, the only treatment for CRAO is an eye massage within the first five to ten minutes. While defendant Carter does not remember whether he spoke to plaintiff or whether he did anything in response to plaintiff's request for medical attention, plaintiff clearly did not receive medical attention for his blindness or pain for a week. Plaintiff presents a genuine issue of material fact as to whether defendant Carter knew of plaintiff's blindness, a serious medical need and a clearly escalating emergency situation, and deliberately disregarded it. The treatment recommended by defendant Gavett may have restored plaintiff's sight. For the above reasons, the Court will deny defendant MDOC's motion for summary judgment in part with respect to Count III as asserted against defendant Carter.

Plaintiff, however, does not establish that he informed defendants Moore and Campbell of the onset of his blindness in a timely manner to allow them to take action. Plaintiff must go "beyond the pleadings to demonstrate that there is a genuine issue of fact about whether the defendants ignored a critical or escalating situation or that the delay posed a substantial risk of serious harm." Beyerbach v. Sears, 49 F.3d 1324, 1327 (8th Cir. 1995) (overturned on other grounds in Johnson v. Jones, 515 U.S. 304 (1995)). Plaintiff's allegations against defendant Moore, the Superintendent of the NECC, fall under a respondeat superior theory of liability. However, supervisory personnel are not liable under § 1983 absent "a showing of direct responsibility for the improper action" or "personal involvement of the officer being sued." Harris v. Pirch, 677 F.2d 681, 685 (8th Cir. 1982) (citations omitted). See Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997) ("Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights."); Glick v. Sargent, 696 F.2d 413, 414-15 (8th Cir. 1983) (finding respondeat superior theory inapplicable in § 1983 actions). When plaintiff sought medical treatment on July 15, 2003, he was immediately taken to an optometrist and then an ophthalmologist. No evidence is before the Court that defendant Moore knew of plaintiff's blindness before plaintiff again received medical treatment on July 22, 2003.

"[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006) (citing Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.")). Plaintiff's medical records belie his allegation that defendant Gavett mentioned defendant Campbell's name in speaking to CMS personnel before declaring a medical emergency. Dr. Conley, not defendant Campbell, approved the medical emergency declarations. As plaintiff has not shown that either Moore or Campbell was personally involved, the Court will enter judgment in their favor on Count III of plaintiff's first amended complaint.

**B.   Permanent Injunctive Relief Under the ADA**

Plaintiff asserts Count IV against defendants MDOC, Kempker, Carter, and Moore alleging that they have failed to provide necessary auxiliary aids and services in light of plaintiff's visual impairment. Title II of the ADA, 42 U.S.C. § 12131 et seq., prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity, or

discriminated against by a public entity.[11]  While state prisons qualify as public entities, <u>Penn. Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 209 (1998), the public entity limitation "precludes ADA claims against state officials in their individual capacities." <u>Randolph v. Rodgers</u>, 253 F.3d 342, 348 (8th Cir. 2001).  As plaintiff's first amended complaint sues defendants Moore and Carter in their individual capacities, Count IV will be dismissed with respect to those defendants.  Count IV will also be dismissed with respect to defendant Kempker, as plaintiff's first amended complaint asserts that defendant Kempker is the Superintendent of the NECC but plaintiff's briefing of the instant motions fail to address how defendant Kempker was responsible for denying plaintiff any benefits.

Given the above analysis, Count IV only remains against defendant MDOC.  The aforementioned factors for a permanent injunction also apply to a claim under the ADA.  <u>See</u> <u>Randolph v. Rogers</u>, 170 F.3d 850, 857 (8th Cir. 1999).  To establish a prima facie case under the ADA, plaintiff must show that "1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability."  <u>Id.</u> at

---

[11] A "qualified individual with a disability" is broadly defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

858. "A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1); see also Randolph, 170 F.3d at 858 (requiring "'meaningful access' to programs and activities"). The regulations further require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); see also Gorman v. Bartch, 152 F.3d 907, 911 (8th Cir. 1998) ("Defendants may demonstrate as an affirmative defense that a requested accommodation would constitute an undue burden."). Under the ADA, a reasonable accommodation is all that is required. Alexander v. Choate, 469 U.S. 287, 300 (1985).

Assuming that plaintiff is a person with a disability pursuant to the ADA, the question becomes whether the auxiliary aids and services requested are reasonable. "Auxiliary aids and services" are defined by the ADA to include "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments." 42 U.S.C. §12102(1)(B). "In determining what type of auxiliary aid and service is necessary, a public entity shall

give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2). Plaintiff requests the following auxiliary aids and services: (1) a qualified reader or interpreter in situations where he is required to read presented materials; (2) taped texts, audio recordings, and/or Braille materials so that he can have access to prison reading materials, specifically including legal materials; (3) access to the internet or assistance by prison staff in accessing the internet to retrieve information for the visually impaired;[12] (4) an alternative means to communicate with Mr. Prudden;[13] (5) life-skills training for the visually impaired so that plaintiff can function in the prison population; (6) aid so that he has access to recreational activities, including but not limited to lifting weights and a cardiovascular workout; and (7) an assistant trained to aid the visually impaired.[14] (Pl.'s Mem. in Supp. of Mot. for Summ. J. [Doc. #122] at 11-12.)

As noted above, Douglas Prudden, the ADA On-site Coordinator for the NECC, has provided plaintiff with an untrained

---

[12] Plaintiff's assertion that inmates at the NECC may soon have access to online legal research websites is unsupported.

[13] Plaintiff paradoxically argues that he does not have access to Mr. Prudden, but admits that Prudden has not refused to speak to plaintiff.

[14] Plaintiff in his first amended complaint requests additional benefits, such as a disability needs assessment, but has abandoned those requests during the briefing of the instant motions.

17

prisoner assistant, granted plaintiff the right to use audiotapes for correspondence, allowed plaintiff to receive audio books free of charge by mail, permitted plaintiff to possess a tape recorder, and secured free postage for plaintiff.  Plaintiff admits that the prisoner assistant, whom he selected, reads for him and escorts him everywhere he goes.   (Pl.'s Depo. [Doc. #121-12] at 31.)   The assistant can read materials to plaintiff, fill in forms for him, and aid him in participating in recreational activities, such as weight lifting.  Furthermore, plaintiff can send audio messages with his tape recorder and can listen to audio books when he requests them from the Wolfner Library.

The Court will not grant prospective relief unless the request is:

> narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Plaintiff's demands pose security risks and undue burdens on defendant MDOC.  Allowing inmates to access the internet potentially permits them to send messages concerning criminal activity and download viruses onto NECC computers.  A trained handler capable of assisting plaintiff would not be trained in safety and security matters at the NECC and would require the escort of a prison guard at all times.  Furthermore, plaintiff's request does not specify the length of the handler's presence at

18

the NECC each day.  Additionally, plaintiff's requests for training and counseling to aid plaintiff in "effectively existing" in the NECC general population are not narrowly tailored.[15]

The Court is persuaded that defendant MDOC has made reasonable accommodations for plaintiff's blindness.  Plaintiff's prisoner assistant can help plaintiff complete all the aforementioned activities with which plaintiff seeks aid.  Furthermore, the Court is persuaded that plaintiff's requests are unduly burdensome in light of the accommodations plaintiff has already been provided, which allow plaintiff meaningful access to the programs and activities offered by defendant MDOC.  Consequently, the Court will grant defendant MDOC's motion for summary judgment with respect to Count IV.

## C. Plaintiff's Motion for Partial Summary Judgment

Plaintiff seeks a motion for summary judgment on Count III against defendant Carter and on Count IV against defendant MDOC and Douglas Prudden.  The Court has concluded that a question of fact does exist with respect to Count III as asserted against defendant Carter, making summary judgment unavailable on the issue.  With respect to defendant MDOC, the Court has been persuaded to grant its motion for summary judgment as discussed above.  Finally, Mr. Prudden is not and has never been a party to the instant

---

[15] The Court notes that plaintiff has access to psychologists at the NECC to help him cope with his loss of vision.

action.  For the above reasons, the Court will deny plaintiff's motion for partial summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that the motion for summary judgment of defendants Campbell and Correctional Medical Services [Doc. #100] is granted.

**IT IS FURTHER ORDERED** that the motion for summary judgment of defendants Missouri Department of Corrections, Kempker, Carter, and Moore [Doc. #115] is granted in part with respect to all claims against defendants Missouri Department of Corrections, Kempker, and Moore, and Counts I and IV as asserted against defendant Carter, and denied in part with respect to Count III as asserted against defendant Carter.

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment [Doc. #120] is denied.

Dated this ___6th___ day of February, 2007.

/s/Donald J. Stohr
UNITED STATES DISTRICT JUDGE